Flora Regensburg, as Executrix of the Estate of Jerome Regensburg, Deceased v. Commissioner. Melville E. Regensburg v. Commissioner. Mortimer Regensburg v. Commissioner. Isaac Regensburg v. Commissioner. Melville E. Regensburg, and Sophy P. Regensburg v. Commissioner.
Regensburg v. Commissioner
Docket Nos. 111317, 111318, 111319, 111320, 111322.
United States Tax Court
1943 Tax Ct. Memo LEXIS 355; 1 T.C.M. (CCH) 925; T.C.M. (RIA) 43185; April 20, 1943
*355 Arthur B. Hyman, Esq., 2 Rector St., New York City, and Davis M. Zimmerman, Esq., for the petitioners. Conway N. Kitchen, Esq., for the respondent. STERNHAGEN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax against petitioners as follows: 1936
1937
1938
1939
1940
Estate of Jerome Regensburg, 111317
$14,136.58
$10,305.53
$ 4,616.89
$1,091.77
Melville E. Regensburg, 111318
9,873.15
9,108.40
3,491.27
Mortimer Regensburg, 111319
39,256.82
21,683.33
11,301.90
2,369.14
Isaac Regensburg, 111320
78,703.42
23,033.46
13,442.47
$1,280.53
9,014.23
Melville E. Regensburg, Sophy P. Regens-
burg, 111322
981.32
The petitioners contest respondent's determination that withdrawals made by them from a corporation in which they are shareholders were "taxable 100% as ordinary dividends". They also plead the bar of the statute of limitations. Findings of Fact E. Regensburg & Sons is a New York corporation organized in 1903 for the purpose of manufacturing and dealing in tobacco products. The decedent, Jerome Regensburg, and the other male petitioners herein were the sons of Edward Regensburg, who died in *356 1910. Petitioner, Sophy P. Regensburg, is the wife of Edward's son Melville, with whom she filed a joint return for 1940. The corporation was the successor of a partnership conducted by Edward and his sons, the corporation issuing to them all of its stock, consisting of 1,000 shares of par value of $100, and giving them ratably its interest-bearing notes totaling $223,150.36. The five sons, since the father's death, have been the principal shareholders. From September 1, 1931, to November 6, 1941, they owned all but 75 shares held by other relatives; and from November 6, 1941 on, they owned all but 35 shares held by relatives. The brothers were all officers and directors. The petitioners and the corporation filed their returns in the Third District of New York. Mortimer bought 17 1/2 shares in December, 1939, for $60,000, when their book value was $74,671.27. Four other brothers bought another 17 1/2 shares in October, 1940, for $60,000, whose book value at the close of 1940 was $73,204.77. The corporation surplus was as follows: January 1, 1936
$4,855,067.25
December 31, 1936
4,781,207.08
December 31, 1937
4,599,165.83
December 31, 1938
4,425,437.34
December 31, 1939
4,266,930.67
December 31, 1940
4,183,133.15
*357 The by-laws provided: The Board of Directors shall, by vote, declare dividends from the surplus profits of the Company whenever in their opinion the condition of the Company's affairs will render it expedient for such dividends to be declared by them. Throughout the corporation's history salaries were fixed and dividends were declared at meetings of the Board of Directors formally called for that purpose. The dividends so declared were as follows: Year
Amount
1904
$ 35,000
1905
10,000
1916
25,000
1923
150,000
1924
150,000
1925
150,000
1926
150,000
1927
200,000
1928
300,000
1929
200,000
1931
150,000
1932
150,000
1933
200,000
1934
200,000
1935
200,000
No dividends were declared during the years 1936 to 1940. In 1905, all of the shareholders accepted the corporation's interest-bearing notes in payment of the dividend. When the corporation suffered reverses in 1910, the shareholders formally cancelled these notes and other indebtedness in the amount of $254,126.56, and this amount was added to surplus. In 1915, the Board of Directors increased the petitioners' salaries for 1910-1915 and ordered the increase applied to overdrafts made by petitioners up to *358 December 31, 1915. In the years 1936-1940, the corporation neither declared nor reported any dividends in its income tax returns. From the organization of the corporation in 1903, it maintained individual open accounts with petitioners in which it debited withdrawals and credited salaries, shares of dividends declared, and interest due on its notes held by them. The shares and net withdrawals of petitioners were as follows: 1936
1937
1938
1939
Mortimer
264 Shares
$ 81,552.62
$50,216.13
$33,644.16
Isaac
264 Shares
143,208.96
63,367.32
37,560.55
$5,405.25
Jerome
174 Shares
40,426.30
31,308.83
17,762.11
Melville
114 Shares
32,663.16
30,002.31
14,526.08
1940
Total 1936-1940
Mortimer
281 1/2 Shares
$ 5,774.59
$171,157.50
Isaac
268 3/8 Shares
20,913.57
270,475.65
Jerome
178 3/8 Shares
3,002.28
92,499.52
Melville and Sophy
118 3/8 Shares
3,061.20
80,252.85
Each of the amounts in the foregoing tabulation was a distribution of earnings after February 28, 1913. In addition to credits for salaries, dividends and interest, the accounts show the following credits: Mortimer
Isaac
Jerome
Melville
1906 -
$ 2,500.00
1908 -
$ 1,488.86
1908 -
$ 5,670.08
1908 -
$ 2,276.71
1908 -
3,375.80
1909 -
6,511.14
1925 -
4,457.00
1909 -
1,223.29
1909 -
4,624.50
1912 -
10,000.00
1929 -
2,000.00
1939 -
14,912.66
1931 -
2,512.50
1924 -
15,000.00
1939 -
14,912.66
1939 -
14,912.66
1939 -
14,912.66
*359 In all the years from the beginning of the corporation the amounts withdrawn or otherwise debited annually to each petitioner were greater than the amounts credited to him so that, except in a few early years, the debit balance increased until at the end of 1935 Mortimer's net debit balance was $580,647.88, which had grown at the end of 1940 to $749,388.11; Isaac's net debit balance at the end of 1935 was $1,407,196.16, and had grown at the end of 1940 to $1,677,671.81; Jerome's net debit balance at the end of 1935 was $167,171.30, which had grown by the end of 1940 to $250,053.21; Melville's net debit balance at the end of 1935 was $327,440.61, which had grown by the end of 1938 to $404,632.16, and at the end of 1940 was $398,919.61. After 1910 the credits in each account consisted almost entirely of the fixed salaries and dividends although in the account of each of the four petitioners was credited in 1939 his distributive share, $14,912.66, of their mother's credit balance on the corporation's books at the time of her death, and in 1912 Isaac was credited with a cash contribution of $10,000 and in 1924 a cash contribution of $15,000, neither of which contributions, however, was *360 sufficient to cause a net reduction in his net debit balance for the year. *
No interest was accrued or paid and no note or other evidence of indebtedness given for the debit balances. The withdrawals were made without previous consultation. Melville from time to time protested as to the amount of the withdrawals and promises were given to discontinue or reduce them. Shareholders who were not officers or directors at no time made withdrawals from the corporation or received any funds therefrom except as dividends formally declared. The corporation at all times kept complete account of withdrawals made by petitioners and all credits, carrying the excess of withdrawals over credits as accounts receivable. It treated them as assets and included them on its income tax returns, its balance sheets, and in financial statements to credit agencies and to banks which honored its trade acceptances and extended credit to it. It at no time cancelled, compromised or forgave petitioners' debit balances. Salary and *361 dividends from the corporation constitute practically all of petitioners' income, and they owned no other income-producing property. On October 8, 1934, all of the shareholders made a formal agreement that if any of them should sell any of their shares while indebted to the corporation, so much of the purchase price as would be necessary to discharge such debt, without interest, would be paid to the corporation or, if the corporation were the purchaser, it would make such deduction from the purchase price. The shareholder would continue liable for any unpaid balance. The corporation was given a lien on the shares and the fact of the agreement was to be endorsed thereon. The stock so endorsed was delivered to the corporation. None of the petitioners ever sold any shares of the corporation. Minutes of Special Meeting of Board of Directors of the corporation on May 31, 1938, show that petitioner Mortimer had heavy losses and that large loans made to officers had placed the corporation in an unsatisfactory financial position and stated that such loans must cease. All salaries were then reduced 25 per cent and a resolution was adopted "that effective at once no withdrawals of cash for *362 the purpose of loans to officers be permitted." On May 4, 1942, the corporation filed a claim against the estate of Jerome for $251,277, representing "loans and advances" secured by collateral lien on his shares in the corporation. No objection was made to the claim by the widow-executrix and it has been recognized as a duly proven and binding claim. The total withdrawals, credit and balances of petitioners from 1903 are as follows: Cash withdrawn
or paid on his
Total net
behalf by corpo-
Credits
debit balance
ration 1903-1940
Salary
Dividends
Miscellaneous
Dec. 31, 1940
Mortimer
$2,560,845.08
$1,140,900.03
$555,000.00
$115,556.87
$ 749,388.11
Isaac
3,511,566.80
1,140,900.04
555,000.00
137,994.95
1,677,671.81
Jerome
1,535,028.03
861,595.99
349,800.00
73,578.83
250,053.21
Melville
1,401,400.85
752,645.84
211,650.00
38,185.40
398,919.61
The deficiency notices were mailed on March 6, 1942. The petitioners filed their federal returns for 1936 and 1937 on March 15, 1937, and March 15, 1938, respectively. The amounts of gross income stated in said returns and the amounts of the net withdrawals from the corporation in 1936 *363 and 1937, were as follows, and these were omitted from gross income shown on the return: Ratio of net
Gross income stated
Net withdrawals omitted
withdrawals to
in returns
from returns
reported income
1936
1937
1936
1937
1936
1937
Mortimer
$48,439.75
$48,454.95
$ 81,552.62
$50,216.13
168%
103%
Isaac
48,439.75
48,454.95
143,208.96
63,387.32
295%
130%
Jerome
36,288.72
37,956.48
40,426.30
31,308.33
111%
82%
Melville
35,439.74
35,454.95
32,663.16
30,002.31
92%
84%
Opinion STERNHAGEN, Judge: The petitioners are four of the five brothers who own practically all the shares of the family corporation organized in 1903 to operate the business which they and their father had been operating as a partnership. From the beginning they, as a practice, had withdrawn its funds on an open running account without regard to the mathematical relation between the withdrawals and their respective shareholdings. The individual withdrawals were at pleasure and without previous consultation among them. For many years substantial dividends were declared, and these were credited in their proper proportions to the petitioners on *364 the running accounts. In 1936-1940, the business was not good and the corporation had no current net earnings. It had a large accumulated surplus of prior years, but in the taxable years no dividends were declared and no amounts were credited as dividends to the accounts. Withdrawals, however, continued in large amounts, and these were charged to the accounts with resulting large increases in the net debit balances. Although the established practice was to account for these withdrawals on the corporation's books as loans, and two of the petitioners testified that they expect to pay back the amounts so withdrawn. The fact is that for many years no such payments whatever have been made, even in the taxable years when the corporation had losses, and no act or conduct of any petitioner affirmatively indicates a recognition by him of any indebtedness on this account. The withdrawals were apparently used for personal nonbusiness purposes, in some instances large amounts having been lost in gambling, and there has been no plan for repaying any of the increasing balances and apparently no financial ability to make such payments. Aside from the oral testimony of the two witnesses that they *365 regarded the withdrawals as loans which they expected some day to repay, they have never acted as if they really meant to do so. We cannot regard the ($14,912.66) credit of the several shares in the mother's account as a substantial item in a plan to repay. That was simply a shift from the mother's former account to theirs and does not signify a plan for repayment of the very much greater amounts withdrawn. Nor are we impressed by the 1934 agreement among the shareholders giving the corporation a lien on the shares and purporting to deposit the certificates as collateral. Nothing was done under this agreement to give it any substance, and no occasion arose which required any conduct in fulfillment of its obligations. Its mere existence on paper does not serve to characterize the withdrawals as loans rather than as distributions. The purchase by some of the petitioners of the shares of the younger relatives at book value is also not significant of the character of the withdrawals or the debit balances. That operated to equalize the nonwithdrawing minor shareholders with the others. There is more force in the recognition of the claim against Jerome's estate for the debit balance in *366 his account; but this was in 1942, after the notice of deficiency in this proceeding had been mailed, and whether the claim was in fact paid does not appear. Its importance is therefore substantially lessened, and it does not serve to change the view that the withdrawals were distributions. We think, from all the evidence, that a consistent practice in a family corporation of withdrawing the corporation's earnings on an open account, with only negligible repayments in almost the entire forty years of the corporation's existence, indicates an established method of dividend distribution, and that the Commissioner was correct in including the withdrawals in the petitioners' respective incomes for the years here in question. Many cases are cited by the parties, but none is exactly determinative. On the merits, for each year, as to each petitioner, the respondent's determination is sustained. For 1936 and 1937, the petitioners resist the determination on the further ground that it is barred by the statute of limitation. The respondent meets this by showing that the distributions which are not held to be income and which were omitted from the return are in each instance in an amount equal *367 to more than 25 per cent of the amount shown as gross income on the return. Section 275 (c) of the Revenue Act is therefore applicable which fixes the limitation period at five years. The determinations were timely and the assessments are not barred. Decision will be entered for the respondent. Footnotes
*. These figures are all set forth in a summary tabulation as to each petitioner in respondent's Exhibit A, all of which is by reference hereby incorporated in the findings.↩